IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

IN RE:                                       :        CASE NO. 10-11717 (ESL)

OSCAR TORRES DE JESUS                        :        CHAPTER 11

        Debtor                               :

                                             :

FILED & ENTERED

JAN 23 2012

U.S. BANKRUPTCY COURT
SAN JUAN, PUERTO RICO

OPINION AND ORDER

        Before this court is secured creditor Banco Popular de Puerto Rico's ("BPPR") *Motion to Dismiss* and *Supplement to Motion to Dismiss* (Docket Nos. 80 & 252) on the grounds of Debtor's substantial or continuing loss and/or diminution of the estate and absence of likelihood of rehabilitation and other equitable grounds, and the *Opposition to Motion to Dismiss* filed by Debtor (Docket No. 121). Several other motions and replies regarding Debtor's request for cash collateral have also supported and/or argued BPPR's *Motion to Dismiss* (Docket Nos. 82, 83, 126, 127, 174, 185, 239, 252). Several hearings were held wherein the *Motion to Dismiss* was argued (Docket Nos. 23, 58, 86, 175, 176, 191, 211 & 241), which have provided further information regarding Debtor's performance pre and post petition. After considering all the arguments, pleadings and evidence submitted, based in the totality of the circumstances and the travel of the case, for the reasons stated herein BPPR's *Motion to Dismiss,* as supplemented, is granted.

Procedural Background

        On December 14, 2010, Debtor filed a voluntary Chapter 11 petition, schedules, statement of financial affairs and other related documents (Docket No. 1). BPPR is Debtor's main secured creditor. See Schedule D (Docket No. 1, pp. 9-11), and Proofs of Claims Nos. 2-1, 8-1, 9-1 and 23-1.

        On December 23, 2010, BPPR filed an *Urgent Motion ... Requesting Entry of Order Prohibiting Use of Cash Collateral* (Docket No. 7) alleging that it is a secured creditor in an approximate amount of $12,041,132.74 (principal and interests as of December 20, 2010), that it has properly perfected a first priority position over all of Debtor's inventory, equipment, investment property, accounts receivable, cash and other related intangibles, and that it had offered no authorization to Debtor to use any cash collateral nor had Debtor offered any adequate protection for the use of the same. BPPR requested the court to prohibit Debtor's request for the use of cash collateral without judicial authorization upon the provision of adequate protection under 11 U.S.C.

§ 363(c)(3). On December 27, 2010, the Court entered an order granting BPPR's *Urgent Motion* without prejudice of Debtor moving the court pursuant to 11 U.S.C. § 363(c)(2)(B) and Fed. R. Bankr. P. 4001(b) (Docket No. 11).

On December 28, 2011, the Debtor filed an *Urgent Motion Requesting Use of Cash Collateral* (Docket No. 13) under 11 U.S.C. §§ 363(c)(2)(B) and 363(c)(3). He based his request primarily on his inability to purchase feed for the cattle due to lack of cash to pay for it and the supplier's alleged denial of granting him any further credit. (Id., ¶ 3) He further alleged that the use of cash collateral is essential for him to continue operating his business and produce funds to pay his obligations and operate the milking equipment, especially because he has no other substantial source of funds. (Id., ¶ 11) In regards to the adequate protection to BPPR, Debtor argued that there is sufficient equity cushion in his business and real property when considering their combined value to their liens and encumbrances. He also requested that his *Urgent Motion* be disposed of on an expedited basis pursuant to Puerto Rico Local Bankruptcy Rule ("LBR") 9013-1(f) (Docket No. 14).

On December 29, 2010, the court issued an *Amended Order & Notice* regarding Debtor's *Urgent Motion* for cash collateral and scheduled a hearing to consider it for January 4, 2011 (Docket No. 16). Objections to the *Urgent Motion* were ordered to be filed on or before January 3, 2011. Compliance with F. R. Bankr. P. 4001(b) and LBR 4001-2 was also ordered.

On January 3, 2011, BPPR filed a *Reply to Debtor's Urgent Motion Requesting Use of Cash Collateral* (Docket No. 22) informing of the extrajudicial negotiations between BPPR and Debtor for the interim use of cash collateral and requested until January 5, 2011 to file a joint request to that effect. BPPR also alerted the court that Debtor's expressions in his *Urgent Motion* regarding the equity cushion were based on outdated appraisals and that Puerto Rico's economy had changed since, which has severely affected the value of properties. Thus, BPPR alleged that it may be an under-secured creditor.

A hearing on Debtor's *Urgent Motion* was held on January 4, 2011 . The parties informed that they were attempting to reach an agreement for Debtor's use of cash collateral, specifically for him to purchase of additional cattle to increase his milk production. BPPR in particular informed that the main consideration for that agreement was that Debtor provided the purchase orders and/or

2

delivery receipts that evidenced the specific amounts he requested, and to that Suiza Dairy, Debtor's primary milk purchaser, be ordered to send the weekly milk quotas directly to a marginal account for Debtor controlled by BPPR. An interim agreement was informed to have been reached during the hearing whereby BPPR consented to provide Debtor $10,000 per week to purchase cattle feed, subject to Debtor submitting a purchase order, invoice and/or delivery receipt. In addition, BPPR also consented to provide Debtor up to $2,5000 weekly for the payroll of Debtor's employees and $1,000 weekly for the purchase of diesel or gasoline, provided that Debtor also disclosed the corresponding purchase orders, delivery receipts and/or invoices. Pursuant to said interim agreement, Debtor would direct Suiza Dairy to deposit revenues from his weekly milk quotas into a marginal account controlled by BPPR. The court approved the interim agreement as informed by BPPR and Debtor and ordered them file it in writing within 30 days. (Docket Nos. 22 & 31)

On February 8, 2011, without the parties having filed the joint interim agreement as ordered, the court issued an *Order & Notice* to schedule a Chapter 11 status conference for February 22, 2011. The day before, on February 7, 2011, BPPR filed a *Motion to Prohibit Use of Cash Collateral* (Docket No. 42) informing that Debtor had not provided the stipulated documents and/or information for the interim agreement regarding the use of cash collateral and that even though Suiza Dairy had been notified of the interim agreement approved by the court --which included direct payment from Suiza Dairy to BPPR-- the former had been issuing payments under the milk quotas directly to Debtor, who had in turn disposed of the funds remitted to him in amounts above and beyond the ones accepted and agreed upon by the parties. Under those circumstances, BPPR sustained that it did not consent to the use of cash collateral and insisted to be provided with exact and detailed accounting of all funds Debtor had received from Suiza Dairy since he first filed for bankruptcy as well as a full and accurate accounting of the Debtor's disposal of all such funds with evidence of all purchase orders, invoices and/or delivery receipts relating to the operation of his business. BPPR requested an order prohibiting Debtor from using its cash collateral without its consent outside the scope of the interim agreement perpetuated at Docket No. 31 (January 4, 2011 Hearing Transcript).

The status conference was held on February 22, 2011. See Docket No. 44 (Minutes). BPPR informed its conformity to extend the interim agreement as long as the funds from Suiza Dairy were

3

deposited in a marginal account controlled by BPPR and that the Debtor provided the invoices and evidence of his business operations, purchase orders and related documents. Debtor argued that if he could purchase enough cattle to meet the milk quotas, he could meet all his obligations and pay 100% of general unsecured creditors, considering that there was sufficient equity cushion. The court noted that creditors were not in a position to consider that allegation because Debtor had provided no evidence to that effect: no recent appraisals were proffered and no monthly operating reports ("MOR") had been filed. Consequently, the court ordered Debtor to file the overdue MORs and likewise ordered both parties to file a written agreement on the use of cash collateral as initially ordered at the January 4, 2011 hearing. Debtor also informed that he was in the process of obtaining alternate sources of financing and that he also was finalizing a formal agreement with BPPR in regards to the use of cash collateral.

On February 25, 2011, Debtor filed a *Motion in Compliance with Order* (Docket No. 45) whereby he submitted the documentation he provided to BPPR. On February 28, 2011, Debtor filed an *Emergency Motion Requesting Order* (Docket No. 49) alleging that BPPR had refused to pay checks for feed and diesel, even though there were funds in the operating marginal account. Debtor requested that an order be entered instructing BPPR to allow the immediate disbursement of $32,773.69 for payment of feed and medicines for the cattle, diesel, payroll, small incidental living expenses and to allow payment of an additional $16,360 for the week ending March 4, 2011. An *Emergency Motion* (Docket No. 48) was also filed by Debtor the same day requesting that the *Emergency Motion Requesting Order* (Docket No. 49) be disposed of on an emergency basis.

That same day, on February 28, 2011, the court issued an *Order & Notice* (Docket No. 50) ruling that Debtor's *Emergency Motions* (Docket Nos. 48 & 49) did not place the court in a position to authorize the use of cash collateral, *inter alia*, because the requirements of LBR 4001-2(b) were not disclosed and thus a hearing was scheduled for March 11, 2011.

On March 1, 2011, Debtor filed an *Amended Emergency Motion Requesting Order and Request for Reconsideration* (Docket No. 51) in which he acknowledged having made certain additional payments from those detailed in the order granting the interim agreement between Debtor and BPPR (Docket No. 31 -January 4, 2011 Hearing Transcript) and further requested immediate

payments for feed and medicine for the cattle, diesel and payroll which BPPR had refused to disburse in the amounts of $32,773.69 and an additional $16,360 for the week ending March 4, 2011. Debtor also admitted not having provided BPPR with a detailed accounting of the requested sums and thus requested until March 8, 2011 to provide it.

On March 4, 2011, BPPR filed an *Opposition to Emergency Motion Filed by Debtor on March 1, 2011* (Docket No. 54) alleging that contrary to the interim agreement for cash collateral, Suiza Diary had been issuing payments under the milk quota directly to the Debtor, who in turn had disposed of the funds remitted directly to him in amounts above and beyond those agreed upon by on June 4, 2011, as accepted by the court (Docket No. 31 - January 4, 2011 Hearing Transcript). BPPR also alleged that it had prepared and provided Debtor with a draft of a joint cash collateral agreement and order, that Debtor had not responded or reacted to it and that had he timely responded, the *Emergency Motion* could have been avoided. BPPR also averred that the accounting documents provided by Debtor were in total disarray and that they showed that Debtor had incurred in numerous personal expenses. BPPR requested that Debtor's *Emergency Motion* be denied and the entry of an order to order compel him to submit to BPPR the invoices and other accounting documents supporting the use of cash collateral in an organized fashion as provided in the January 4, 2011 Order (Docket No. 31) and to tender a detailed proposed budget for any future use of cash collateral.

On April 6, 2011, Debtor filed a *Motion Requesting Release of Certain Liens over Milk Quota and Substitution of Collateral in Favor of BPPR* (Docket No. 70). He again requested cash collateral to purchase heads of cattle and make some minor improvements to the farm. To that effect, he sought 10,000 quarts of milk quota to be released from BPPR's lien, which would allegedly allow him to purchase 95-110 heads of cattle. He also proposed to replace BPPR's collateral based on the actual value of the released quota, referring to the heads of cattle to be purchased. That same day, Debtor filed an *Urgent Motion Requesting Use of Cash* (Docket No. 71), in which he rehashed his earlier arguments regarding the use of cash collateral and insisted that BPPR was over-collateralized. He also argued that the cash generated after the filing of the petition is not part of BPPR's collateral and further requested to be allowed to use BPPR's collateral so that he could cover his business expenses and purchase additional cattle to increase milk production. In addition, Debtor also filed an *Urgent*

*Motion Requesting that [BPPR] be Held in Contempt of Court* (Docket No. 73) averring that BPPR had not complied with the agreement approved by the Court. The specific order under which Debtor sustained BPPR's contempt was the March 11, 2011 hearing, which Minute Entry was filed at Docket No. 58.

On April 7, 2011, the court scheduled another a hearing to consider Debtor's aforementioned motions for cash collateral for April 12, 2011 (Docket No. 76). The next day, on April 8, 2011, Debtor filed a *Motion Requesting Release of Certain Liens over Milk Quota and Substitution of Collateral in Favor of BPPR* (Docket No. 77) which is the same entry as Docket No. 70[1]. Also on April 8, 2011, BPPR filed a *Motion to Dismiss* (Docket No. 80), an *Opposition to Debtor's Urgent Motion Requesting that [BPPR] be Held in Contempt* (Docket No. 82) and an *Opposition to Debtor's Urgent Motion Requesting Cash Collateral* (Docket No. 83). In its *Motion to Dismiss* (Docket No. 80), BPPR seeks dismissal of the instant case under Section 1112(b) of the Bankruptcy Code, 11 U.S.C. § 1112(b), sustaining that there is no legitimate bankruptcy purpose for the following reasons: (a) substantial or continuing loss and/or diminution of the estate and absence of likelihood of rehabilitation; (b) Debtor's failure to file a disclosure statement or to file or confirm a plan within a reasonable period of time; and © other equitable grounds. In its *Motion to Dismiss*, BPPR sought dismissal of the case, not conversion to a Chapter 7. In its *Opposition to Debtor's Urgent Motion Requesting that BPPR be Held in Contempt of Court* (Docket No. 82), BPPR claimed that it was Debtor who had not complied with the interim agreement having made unallowed disbursements from the payments that he received directly from Suiza Dairy, which were not deposited into the agreed marginal account. BPPR also alleged that it had not received one single payment from Debtor since the inception of this case. In its *Opposition to Debtor's Urgent Motion Requesting Use of Cash Collateral* (Docket No. 83), BPPR reiterated to have prepared and sent Debtor's counsel a draft of a joint motion and a proposed order for the use of cash collateral since January 3, 2011 to no avail. It also claimed to be an undersecured creditor, rather than oversecured, pursuant to appraisals it had recently conducted upon Debtor's properties. On April 11, 2011, BPPR filed an *Opposition to*

---

[1] A *Notice of Corrective Entry* was entered at Docket No. 78 regarding the refiling of Docket No. 70.

6

*Debtor's Motion Requesting Release of Certain Liens over Milk Quota and Substitution of Collateral in Favor of BPPR* (Docket No. 85) claiming that Debtor's request did not propose to pay BPPR's claim in full but rather intends to alter BPPR's state law property rights by eliminating the lien, to which it opposed.

On April 12, 2011, the court held the hearing to consider Debtor's request for cash collateral, the release of certain liens over the milk quota and substitution of collateral and BPPR's motion to dismiss. See the Minute Entry at Docket No. 86. Since no written agreement had been filed, both BPPR and Debtor again informed during the hearing once again that they had reached an interim agreement whereby Debtor would withdraw its motion of contempt and BPPR would allow Debtor to use $18,000 per week without BPPR's permission. The court once more ordered the that the agreement be filed in writing. As to the rest of the contested matters (Docket Nos. 70, 71, 77 & 83), the court ruled that it would schedule an evidentiary hearing after the parties had the opportunity to supplement their respective oppositions. The evidentiary hearing for cash collateral and release of the liens was scheduled for June 9, 2011 (Docket No. 89) and the one to argue BPPR's *Motion to Dismiss* was scheduled for June 13, 2011 (Docket No. 90). All were continued on July 13, August 15-16[2] & 31(Docket Nos. 144, 153, 156, 175, 176, 191).

On April 27, 2011, BPPR filed a *Motion in Compliance with Court Order Re: BPPR's Supplemental Opposition to Debtor's Motion to Release Liens over Milk Quotas* (Docket No. 101) opposing to the sale of the milk quota as proposed by Debtor on the grounds that it does not have adequate protection and requested an order for Debtor to consider and/or seek other means of post-petition financing that will not alter or impair BPPR's existing liens and/or secured position.

On April 28, 2011, BPPR filed a *Supplement to [its] Opposition to Debtor's Urgent Motion Requesting Use of Cash* (Docket No. 105) contending that the funds Debtor had been generating from the sale of the post-petition produced milk are subject to its lien and thus constitutes its cash collateral

---

[2] During that August 16, 2011 hearing, Banco Santander ("Santander"), another secured creditor, informed its support to BPPR's *Motion to Dismiss* (Docket No. 80). Notwithstanding, Santander later filed a *Motion for Relief From Stay Under 11 U.S.C. Section 362[e]* on October 4, 2011 (Docket No. 209), which was granted at the hearing held on November 1, 2011 upon stipulation by the parties (Docket No. 221).

under 11 U.S.C. § 522(b).

On May 31, 2011, the US Trustee filed a *Motion to Compel Filing of Monthly Operating Reports and Payment of Quarterly Fees* (Docket No. 123), alleging that Debtor had not filed the monthly operating reports for the months of March and April 2011 and that the absence of the information required in those reports renders the Trustee and creditors incapable of determining whether debtors are engaged in actions which have resulted in loss or diminution of the estate warranting dismissal under Section 1112(b) of the Bankruptcy Code. The court granted the motion on June 30, 2011 (Docket No. 147).

On May 20, 2011, Debtor filed his *Opposition to [BPPR's] Motion to Dismiss* (Docket No. 121). He contends that his business has substantially improved on a monthly basis since the beginning of the case due to the fact that he can now properly take care of his cattle. He also suggests that he has a plan of action that will allow him to meet all of his monthly obligations and pay BPPR in full, which was detailed in the *Motion for Use of Cash Collateral & Motion for Substitution of Collateral* (Docket Nos. 70 & 71). He then argued that BPPR is oversecured based on recent appraisals of his properties as filed at Docket No. 104 and that in the alternative, if BPPR's appraisals were correct, then the BPPR's secured debt would be bifurcated, which would result in Debtor paying a lower amount in a monthly basis. Debtor also sustained that BPPR failed to show that he does not have a chance of reorganizing its business and that if his request for use of cash and/or the substitution of collateral was successful, then there should be no reason to dismiss the case for not filing his disclosure statement. Finally, Debtor refuted that the case should be dismissed on equitable grounds, especially considering his unencumbered assets, the alleged upward trend on his business and its plan for increasing income further, all of which, according to him, show his ability to reorganize.

On June 1, 2011, BPPR and Debtor filed two separate *Joint Pretrial Reports*: one regarding Debtor's *Motion for Use of Cash* (Docket No. 126) and another for Debtor's *Motion for Substitution of Collateral* (Docket No. 127). In both *Reports*, Debtor and BPPR stipulated uncontested facts, argued their respective theories and offered their proposed findings of fact and evidence. Further related motions were filed to submit documents (Docket Nos. 131, 132, 135, 136 & 137).

8

The evidentiary hearing commenced on June 9, 2011 (Docket No. 139) and continued on July 13, August 15-16 & 31 (Docket Nos. 144, 148, 153, 156, 175, 176, 191). Oral testimonies and documentary evidence were presented by Debtor and BPPR.

Meanwhile, on August 12, 2011, Debtor filed a *Motion Withdrawing Request for Use f Cash and Requesting a Period to File a Motion Pursuant to § 506(a)(1)* (Docket No. 159) claiming that although his initial position was that BPPR was oversecured, in light of BPPR's allegation that his properties were valued slightly over $6,000,000.00 he requested to stripdown BPPR's secured debt. Also on August 12, 2011, Debtor filed a *Second Urgent Motion Requesting that BPPR Be Held in Contempt of Court* (Docket No. 160). On August 15, 2011, Debtor filed an *Urgent Motion Pursuant to 11 U.S.C. § 502(A)(1) for Provisional and Permanent Use of Cash Collateral* (Docket Nos. 163). Two days later, on August 17, 2011, he filed an *Urgent Motion for Provisional and Permanent Use of Cash Collateral* (Docket No. 168) and a *Motion Pursuant to 11 U.S.C. § 506(A)(1)* (Docket No. 170). The next day, on August 18, 2011, the court scheduled a hearing for August 31, 2011 (Docket No. 172) and denied Debtor's *Motion Pursuant to 11 U.S.C. § 506(A)(1)* (Docket No. 170) for failure to comply with LBR 9013-1(h) (Docket No. 171). Debtor then proceeded to file an *Amended Motion Pursuant to 11 U.S.C. § 506(A)(1)* on August 18, 2011 (Docket No. 173). Also on that day, BPPR filed its *Opposition to Use of Cash Collateral* (Docket No. 174) and then on August 25, 2011, BPPR filed its *Opposition to Debtor's Second Urgent Motion Requesting that BPPR be Held in Contempt* (Docket No. 184). The next day, on August 26, 2011, BPPR and Debtor separately filed their respective *Proposed Findings of Fact* (Docket Nos. 185 & 186). On August 30, 2011, Debtor filed a *Reply to Opposition to Urgent Motion for Provisional and Permanent Use of Cash Collateral* (Docket No. 188). On September 1, 2011, BPPR filed an *Opposition to Amended Motion Pursuant to 11 U.S.C. § 506(A)(1)* (Docket No. 192) and the next day Debtor filed a *Reply* thereto (Docket No. 195).

Further hearings were held on October 5, November 1 and 29, 2011, regarding Debtor's motions for cash collateral (Docket Nos. 211, 221 and 241). On November 18, 2011, Debtor filed his *Disclosure Statement* (Docket No. 226) and *Plan for Reorganization* (Docket No. 227).

On November 21, 2011, Debtor filed another *Urgent Motion for Provisional and Permanent*

9

*Use of Cash Collateral* (Docket No. 229). This time Debtor offered for the first time to make monthly interest payments as adequate protection in the amount to $3,685.00 per week and requested that the marginal operational account, which is controlled by BPPR, be "unfrozen" and "unrestricted"[3]. He also proposed the interest rate to be 3% because he understands that rate to be the market rate for this type of loan[4]. He attached as Exhibit 2[5] his projections and proposed budget from December 2011 through March 2012. On November 28, 2011, BPPR filed an *Opposition* thereto (Docket No. 239), and reiterated its *Motion to Dismiss* (Docket No. 80) sustaining that Debtor's request to increase milk production must be confronted with his history of increased costs, inclement weather, ill cattle and revenues less than anticipated. BPPR also claims that Debtor's projections are overly ambitious and unrealistic based on the actual record before the court and that his proposed plan is unfeasible, especially without additional outside financing.

Another hearing to consider Debtor's request for cash collateral was held on November 29, 2011 in which after considering the travel of the case, the court ruled that Debtor had failed to meet his burden for the use of cash collateral. See Docket Nos. 241 (Minute Entry) & 253 (Order). On December 2, 2011, Debtor filed his operating reports for the months of September and October 2011 (Docket Nos. 243 & 244) and on December 9, 2011, he filed the one for November 2011 (Docket No. 250). On December 12, 2011, Debtor filed a *Motion for Reconsideration* (Docket No. 251) on the court's denial for his latest motion for cash collateral (Docket Nos. 229, 241 & 253) alleging that he had increased his productivity and once again requested the use of cash collateral retroactively (to start in December 2011) through April 2012 in exchange of interest payments ($3,685.00 per week) and principal ($2,507.00 per week) starting the third month. In addition, he also requested $60,000.00 for the purchase of additional cattle for the month of December 2011.

On December 14, 2011, BPPR filed a *Supplement to Motion to Dismiss or Convert and*

---

[3] See Docket No. 229, p. 6, footnote 7.

[4] See Docket No. 229, p. 7, ¶ 26.

[5] Exhibit 2, as filed, can hardly be read even with a magnifying glass because the font size is almost minimal and its resolution is extremely poor. Thus, reference made herein are based on the numbers the court can decipher from that document.

10

*Opposition to Debtor's Motion for Reconsideration* (Docket No. 252) incorporating the most recent activity regarding other creditors including *inter alia*: Banco Santander's lift of stay with respect to a mortgage on one of Debtor's real property (Docket Nos. 209, 210, 212 & 221) and Doral Bank's lift of stay with respect to another of Debtor's real property (Docket Nos. 223, 224, 231 & 246). BPPR alleges that Debtor's *Disclosure Statement* proposed *Plan for Reorganization* are deficient and that in view of the most recent activity of this case, Debtor is cannot present adequate protection and cannot achieve a feasible plan within a reasonable period of time, and that orderly liquidation of Debtor's assets is warranted under the control and guidance of a Chapter 7 Trustee[6]. BPPR also opposed Debtor's *Motion for Reconsideration* for the same reasons.

On December 15, 2011, Debtor's *Motion for Reconsideration* was denied (Docket No. 253). The next day, on December 16, 2011, Debtor filed another *Urgent Motion for Provisional Use of Cash Collateral* (Docket No. 256). This time, Debtor only requested cash collateral for operational expenses, not for additional cattle, and thus his projections for the months of December 2011 through March 2012 (attached as Exhibit 3 thereto) are calculated without new cattle.

On January 10, 2012, BPPR filed its *Objection to Approval of Debtor's Disclosure Statement* (Docket No. 274) alleging that Debtor's *Disclosure Statement* did not satisfy the requirements of Section 1125 of the Bankruptcy Code, 11 U.S.C. § 1125, that he failed to provide adequate information to creditors, and that his *Plan for Reorganization* is not confirmable. BPPR once more renewed its request for dismissal.

Stipulated facts (Docket Nos. 126, p. 9, and 127, p. 5)

1. Debtor is the owner of a Dairy Farm located in Isabela, Puerto Rico, comprised of 237 acres of land.

2. Debtor is the owner of the property located in PR-2, Km 87.7, Pueblo Ward, Hatillo, Puerto Rico.

---

[6] Although BPPR had expressly alleged in his *Motion for Reconsideration* (Docket No. 80, p. 3, footnote 1) that pursuant to 11 U.S.C. § 1112(c) the court may not convert a case from Chapter 11 to Chapter 7 when debtor is a farmer, months later, in its *Supplement to Motion to Dismiss* (Docket No. 252), BPPR requested for the first time that this case be converted.

11

3.    Debtor is the owner of certain dairy farm equipment located in the dairy farm and the same is unencumbered.

4.    Debtor owns 130,587 quarts of milk quota.

Pertinent proven facts during the evidentiary hearings and the rest of the case docket[7]

1.    Debtor's dairy farm is his main business and source of income.

2.    Since Debtor filed for bankruptcy, he has been operating its business and managing his affairs as debtor in possession ("DIP").

3.    Debtor has a milk production quota of 130,587 quarts, entitling him to sell that amount of milk every 14 days at a price of $0.855 a quart which he delivers to Suiza Dairy, Corp.

4.    BPPR has various claims against Debtor in the total amount of approximately $12,041,132.75, which are secured by real estate and personal property mortgages, including a lien on Debtor's milk quota, general intangibles, inventory, equipment, accounts receivables and cash. [Proof of Claims Nos. 2-18-19-1 & 23-1].

5.    The value of BPPR's secured collateral is $6,318,000.00. This amount is derived from BPPR's appraisal of his dairy farm in the amount of $3,218,000.00, plus $225,000.00 from debtor's interest in the commercial property belonging to the estate of his deceased father (which has been mortgaged in favor of BPPR), plus $2,875,000.00, which is the value of Debtor's milk quota. BPPR holds a lien over Debtor's cash collateral through the pledging or assigning as collateral the milk quota. The production of milk is also subjected to BPPR's lien.

6.    Since the filing of the Bankruptcy Petition, Debtor has not serviced his loans with BPPR.

7.    During the August 16, 2011 evidentiary hearing, Debtor presented the testimony of Maricarmen Márquez Colón, who testified about her intention to purchase Debtor's dairy farm's note from BPPR with a discount or refinance his debt through one of her

---

[7] The last of these evidentiary hearings was held on November 29, 2011. See Transcript at Docket No. 271.

12

corporations. She also informed that the funds existed but due to certain electronic wiring difficulties, they would be available the next Monday or Wednesday at the latest. No further information regarding this transaction was ever provided to the court by either Debtor or BPPR.

8. Debtor has not proposed to the court any method to acquire cattle other than eliminating BPPR's lien over the milk quota.

9. Debtor is currently producing about 50% of his quota and although he used to produce 100% of his quota, for the past 4 or 5 years he has been unable to do so.

10. There is virtually no unencumbered property belonging to Debtor available for the distribution to unsecured creditors.

11. The cumulus of the litigation of the present case revolves mainly around Debtor and BPPR, who is Debtor's main creditor in this case, secured or unsecured.

12. Under his pre-petition obligations, Debtor is required to make mortgage payments of principal and interests to BPPR that amount to $34,618.91 monthly.

13. Debtor's regular mortgage payment to Banco Santander (another secured creditor) is $5,129.64 monthly. Banco Santander is secured by a first rank mortgage on real property located at Puerto Rico Highway 490 Km. 1.4 Hato Arriba Ward Arecibo, Puerto Rico.

14. The Hato Arriba Ward real property secures a first rank mortgage held by Banco Santander on a loan that as of the date of petition has a balance of $673,359.09 according to the unobjected proof of claim.

15. The combined amount of BPPR's and Banco Santander's claims substantially exceeds the total value of all of the Debtor's real property.

16. According to Debtor's Schedule I, his Current Income of Individual Debtor (dated December 14, 2010), he reported a combined average monthly income of $88,533.66. This income consisted of $84,733.66 in regular income from the operation of his dairy farm and $3,800.00 in income from real property.

17. In his Schedule J (Current Expenditures of Individual Debtor), he informed his

13

creditors that he had average monthly expenses of $80,215.50. These expenses consisted of $73,410.50 per month in regular expenses from the operation of his dairy farm plus $6,805.00 in other personal expenses (including a monthly home mortgage payment of $3,875.00). He also reported that he earned a monthly net income of $8,318.16 (that is, $88,533.66 in average monthly income minus $80,215.50 in average monthly expenses, which equals $8,318.16).

18. At the August 15th and 16th, 2011 hearings, Debtor and BPPR stipulated that Debtor's weekly recurring expenses for the operation of his dairy farm were $18,200.00, exclusive of mortgage payments. Thus, Debtor's average monthly operating expenses (exclusive of debt servicing) are in the amount of $72,400.00 (that is, $18,200 x 4 weeks is $72,400.00).

19. Debtor is also responsible for the following additional monthly mortgage payments: (a) $650.00 to Doral Financial for house number 5 in Arboleda; (b) $650.00 to Oriental Financial for house number 6 in Arboleda.

20. The per diem interest rate on Debtor's loans to BPPR at the stipulated 6% default rate are as follows: (a) $1,771.34 for loan number 3001; (b) $29.38 for loan number 4001; (c) $46.38 for loan number 5001; and (d) $46.38 for loan number 9032. Altogether, these loans add up to $1,893.48 *per diem* in interest

21. At the hearings held on August 15 and 16, 2011, Debtor testified that he was responsible for the monthly payments of approximately $650.00 to Doral Financial and Oriental Financial respectively, and that he had not made any payments on these two mortgages since filing for bankruptcy. He also noted that he had not paid the mortgage on his primary residence to Banco Santander since filing for bankruptcy. Although he disputed the interest amount owing to Banco Popular, he nonetheless admitted that he had not paid anything to Banco Popular since December 24, 2010 (the date of his bankruptcy petition).

22. In summary, Debtor's average monthly expenses are as follows:

14

| General expenses: | $72,400.00 |
|---|---|
| BPPR (debt service) | $34,618.91 |
| Banco Santander | 5,129.64 |
| Doral Financial | 650.00 |
| Oriental Financial | 650.00 |
| **TOTAL** | **$113,448.55** |

23. On Schedule D, Creditor's Holding Secured Claims, Debtor reported the following secured claims: (a) $649,171.32 owing to Banco Popular on a loan to Productos Edgar, Inc.; (b) $10,628,056.58 owing to Banco Popular on a loan of his dairy operations; © $666,674.43 owing to Banco Santander on his home in Isabela (which he valued at $750,000.00); (d) $89,389.21 owing to Doral Financial on house number 5 in Arboleda (valued at $120,000); and (e) $88,636.24 owing to Oriental Financial on loan number 6 at Arboleda (which he valued at $120,000).

24. On Schedule E, Creditors Holding Unsecured Priority Claims, Debtor acknowledged owing the following priority tax claims:

| CRIM | Arboleda 5 | $10,585.14 |
|---|---|---|
| CRIM | Isabela | 4,997.39 |
| CRIM | Arboleda 6 | 6,044.08 |
| Fondo | Insurance | 2,113.35 |
| IRS | Taxes | 70,065.47 |
| | **TOTAL** | **$93,805.43** |

25. Hin his *Statement of Financial Affairs*, Debtor reported gross income from his dairy operations as follows for the past 3 years prior to his bankruptcy petition.

| 2008 | $1,472,158.00 |
|---|---|
| 2009 | $1,417,208.82 |
| 2010 | $1,062,522.73 |

26. Debtor's gross income has declined almost by about a third during the past 3 years.

His gross income for the 2010 fiscal year translates into approximately $88,543.55 per month. With an average gross monthly income of $88,543.55, Debtor is unable to comply with his average monthly expenses of $112,174.64. He is approximately $24,000 short on cash each month *vis à vis* his reported monthly expenses.

27. During the one year period immediately preceding the filing of his Chapter 11 petition, Debtor had been sued in mortgage foreclosure and collection of money by Banco Santander, Oriental Financial and Doral Financial

28. Debtor had not remitted any payments to Banco Santander since filing for Chapter 11 relief.

29. Debtor's Monthly Report of Operations for June 2011 reflects total receipts of $107,747.45, minus total disbursements of $98,641.40 for a total net cash flow of $9,106.05. Docket No. 166.

30. In Debtor's June 2011 MOR, p. 21, under the heading "Notes, Leases and Adequate Protection Payments", he reported the following:

| Secured Creditor | Scheduled Monthly Payment | Total past due from past months | Amount paid during the month | Total unpaid post-petition | Number of payments past due |
|---|---|---|---|---|---|
| BPPR | 34,618.91 | 69,237.82 | - | 242,332.37 | 7 |
| Banco Santander | 300 | 600 | - | 2,100 | 7 |
| Doral Financial | 646.21 | 1,292.42 | - | 4,523.47 | 7 |
| Oriental Group | 688.53 | 1,377.06 | - | 4,819.71 | 7 |
| Banco Santander | 3,9828.32 | 7,656.64 | - | 26,798.24 | 7 |
| Scotia Bank | 1,971.32 | 3,942.64 | - | 13,799.24 | 7 |

31. Therefore, to that date, Debtor was at least 7 payments past due, his scheduled monthly payment due to Banco Popular is $34,618.91, and his total unpaid post petition debt due to Banco Popular was around $242,332.37 ($34,618.91 x 7 months past due). Also as to that date, the grand total of all unpaid post petition payments

16

was $294,373.03. This amount of unpaid post-petition debt exceeds the amount available in Debtor's marginal account at BPPR (which according to the Debtor was approximately $277,192.82 as to August 12, 2011). Exhibit M presented by debtor at the August 16th hearing. Thus, the Debtor was about $17,180.21 short of meeting his on going expenses at the time the *Motion to Dismiss* was filed. Debtor has not serviced any amounts to BPPR from June 2011 to the present either.

32. Debtor requested loans from BPPR to purchase additional cows for his herd on August 15, 2007, August 8, 2008 and September 25, 2009. Despite the BPPR's concession of these loans, Debtor has been unable to comply with his repayment obligations to BPPR.

33. The historical record shows that during the 2010 fiscal year debtor generated gross sales of approximately $88,543.55 per month. On Schedule J, Mr. Torres stated that he received a monthly net income of $8,318.16 (without servicing his secured debts).

34. Neither the Debtor nor his external CPA, Mr. Monge, explained precisely how Debtor will cover his $39,774.64 in monthly debt servicing with a monthly net income of $8,318.16

35. Debtor was granted time from June 13, 2011 to date to obtain alternate sources of financing for his daring operations. Nevertheless, he was unable to secure any such third party or outside financing.

36. Exhibit 12 submitted by Banco Popular and the debtor with their joint Pre Trial Report dated June 1, 2011 at docket entry number 126 (filed in connection with the related contested matter arising from debtor's earlier motion from Use of Cash Collateral) shows that Banco Popular declared debtor's default on December 13, 2010, thereby activating the fixed default rate of 6% on his outstanding loans with the bank.

37. Debtor has not requested that this case be converted into a Chapter 7.

38. The lift of the automatic stay has been lifted in regard to real property securing Banco Santander's and Doral Bank's credits. See Docket Nos. 209, 210, 212, 221, 223, 246.

17

Applicable Law & Analysis

Section 1112(b)(1) of the Bankruptcy Code provides as follows:

> Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court **shall** convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate. 11 U.S.C. § 1112(b)(1) (Emphasis ours.)

The Court's discretion to dismiss or convert a Chapter 11 case is limited if cause is established. See Gilroy v. Ameriquest Mortg. Co. (In re Gilroy), 2008 Bankr. Lexis 3968, 2008 WL 4531982 (B.A.P. 1st Cir. 2008); and AmeriCERT, Inc. v. Straight Through Processing, Inc. (In re AmeriCERT, Inc.), 360 B.R. 398, 401 (Bankr. D. N.H. 2007) ("Prior to its amendment, the statute provided that a court 'may' dismiss the case upon finding cause, but amended section 1112(b) provides that a court 'shall' dismiss if cause is found, absent unusual circumstances."). The initial burden is on the movant to argue and present evidence by a preponderance of the evidence standard to prove its position that there is cause for either conversion or dismissal of the Chapter 11 case, whichever is in the best interests of creditors and the estate. See Alan N. Resnick & Henry J. Sommer, 7 Collier on Bankruptcy ¶1112.04[4] (16th Ed. 2011). "Thus, until the movant carries this burden, the statutory direction that the court 'shall convert the case to a case under chapter 7 or dismiss the case' is not operative." Id. "Cause" is demonstrated through the preponderance of evidence standard. See Keven, A. McKenna, P.C. v. Official Comm. of Unsecured Creditors (In re Keven, A. McKenna, P.C.), 2011 U.S. Dist. LEXIS 57985 (D.R.I. 2011); In re El Legado, 2010 Bankr. LEXIS 1676, 2010 WL 1924439 (Bankr. D.P.R. 2010); In re Woodbrook Assoc's., 19 F.3d 312 (7th Cir. 1994); Colonial Daytona Ltd. Partnership v. American Sav. of Fla., 152 B.R. 996, 1001-1002 (M.D. Fla. 1993). Once "cause" is established, the burden shifts to the debtor to demonstrate "unusual circumstances" that establish that dismissal or conversion to Chapter 7 is not in the best interests of the creditors and the estate. See Alan N. Resnick & Henry J. Sommer, 7 Collier on Bankruptcy ¶ 1112.05[1] (16th Ed. 2011) and In re Dr. R. Samanta Roy Institute of Science Technology Inc., 2011 US App. Lexis 12148 at *8 (3rd Cir. 2011) (once cause is found, the burden shifts to the opposing party to show why

18

dismissal or conversion would not be in the best interests of the estate and the creditors). The bankruptcy court retains broad discretion in determining whether unusual circumstances exist and whether conversion or dismissal is in the best interest of creditors and the estate. Gilroy v. Ameriquest Mortg. Co. (In re Gilroy), 2008 Bankr. Lexis 3968 (1st Cir. B.A.P. 2008). A determination of unusual circumstances is fact-intensive and contemplates facts that are not common to Chapter 11 cases. See Alan N. Resnick & Henry J. Sommer, 7 Collier on Bankruptcy ¶1112.05[1] (16th Ed. 2011). If the Chapter 11 case is devoid of "unusual circumstances", then the bankruptcy court must apply the Section 1112(b)(2) analysis to determine whether the Chapter 11 case should be dismissed or converted to a Chapter 7. The objecting party must establish all of the factual elements stated in subparagraphs (A) and (B) of section 1112(b)(2). Id. In sum, a bankruptcy court may not convert or dismiss a case if: "(1) there is a reasonable likelihood that a plan will be confirmed within a reasonable time; (2) the 'cause' for dismissal or conversion is something other than a continuing loss or diminution of the estate coupled with aJanuary 20, 2012 lack of reasonable likelihood of rehabilitation; and (3) there is a reasonable justification or excuse for a debtor's act or omission and the act or omission will be cured within a reasonable time." In re Orbit Petroleum, Inc., 395 B.R. 145, 148 (Bankr. D. N.M. 2008) aff'd, 421 B.R. 602 (B.A.P. 10th Cir. 2009).

Although Section 1112(b)(4) of the Bankruptcy Code fails to define what "cause" means, it does provide a list of circumstances that constitute "cause" for conversion or dismissal. The list of causes is non-exhaustive and thus a case may be converted or dismissed for other causes. See AmeriCERT, Inc. v. Straight Through Processing, Inc. (In re AmeriCERT, Inc.), 360 B.R. at 401, and Tuli v. US Trustee, 124 Fed. Appx. 830, 831 (5th Cir. 2005). See also 11 U.S.C. § 1112(b)(4) (using the term "includes" before listing various reasons for dismissing a case). A bankruptcy court may also "dismiss a Chapter 11 petition for any reason cognizable to the equity power and conscience of the court as constituting an abuse of the bankruptcy reorganization process." In re 347 Linden LLC, 2011 U.S. Dist. LEXIS 78843 at *10, Bankr. L. Rep. (CCH) P82, 042 (E.D.N.Y. July 20, 2011), citing In re HBA E., Inc., 87 B.R. 248, 258 (Bankr. E.D.N.Y. 1988).

Thus, for purposes of 11 U.S.C. § 1112, under the particular facts of this case, the term "cause" includes, but is not limited to, the following:

19

(A)    substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;

...

(F)    unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter [11 U.S.C. §§ 1101 et seq.]

After the moving party establishes cause to dismiss or convert the case to Chapter 7 and that there are no "unusual circumstances", the court must choose between dismissal or conversion, "whichever is in the best interest of creditors and the estate." 11 U.S.C. § 1112(b)(1). Generally, the standard for choosing between conversion or dismissal based on "the best interest of creditors and the estate" implies the application of a balancing test by the bankruptcy court. See In re De Jounghe, 334 B.R. at 770, and In re Staff Inv. Co., 146 B.R. 256, 260 (Bankr. E.D. Cal. 1992). The legislative history shows that Congress intended to invest the bankruptcy court with "wide discretion ... to make an appropriate disposition of the case" and "to consider other factors as they arise, and use its equitable powers to reach an appropriate result in individual cases." In re De Jounghe, 334 B.R. at 770, citing H.R. Rep. No. 595, 95th Cong., 2d Sess. 406, reprinted in 1978 U.S.C.C.A.N. 5963, 6361-62. Notwithstanding, Section 1112© prohibits conversion to a Chapter 7 "if the debtor is a farmer or a corporation that is that is not a moneyed business, business, or commercial corporation, unless the debtor requests such conversion".

Each applicable cause will be discussed separately.

[A]    *Substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation*

This cause entails a two-fold inquiry: (1) whether after the commencement of the case, the debtor has suffered or continued to experience a negative cash flow, or, alternatively, declining asset value; and (2) whether there is any reasonable likelihood that the debtor, or some other party, will be able to stem the debtor's losses and place the debtor's business enterprise back on a solid financial footing within a reasonable amount of time. Both tests must be satisfied in order for cause to exist under cause. See Alan N. Resnick & Henry J. Sommer, 7 Collier on Bankruptcy ¶ 1112.04[6][a] (16th Ed. 2011). Also see In re Citi-Toledo Partners, 170 B.R. 602, 606 (Bankr. N.D. Oh. 1994) ("Section 1112(b)(1) contemplates a 'two-fold' inquiry into whether there has been a 'continuing diminution of the estate and absence of a reasonable likelihood of rehabilitation.'")

20

(citations omitted). To satisfy the first prong, "[a]ll that need be found is that the estate is suffering some diminution in value". In re Kanterman, 88 B.R. 26, 29 (S.D.N.Y. 1988)[8], also cited in In re Citi-Toledo Partners, 170 B.R. at 606, and Taub v. Taub (In re Taub), 427 B.R. 208, 230 (Bkrpt. E.D.N.Y. 2010), aff'd at 2010 U.S. Dist. LEXIS 104805, E.D.N.Y. August 30, 2010). To consider the diminution of the estate, the court must evaluate the current condition of the estate and look beyond financial statements. Canpartners Realty Holding Co. IV, L.L.C. v. Vallambrosa Holdings Co., 419 B.R. 81, 88 (Bankr. S.D. Ga. 2009). If the court finds that there is in fact such diminution, it must then consider the second prong: whether or not "the Debtor or another party [will] be able to 'stop the bleeding' and return the debtor to solid financial footing within a reasonable amount of time." Alan N. Resnick & Henry J. Sommer, 7 Collier on Bankruptcy ¶ 1112.04[6][a] (16th Ed. 2011). For purposes of this cause, "likelihood of rehabilitation" does not equate "reorganization". Id. Rehabilitation contemplates the successful maintenance and re-establishment of the debtors' business operations and "to put back in good condition; re-establish on a firm, sound basis." In re Vallambrosa Companies, 274 B.R. 721, 725 (Bankr. N.D. Oh. 2002) See also Loop Corp. v. United States Trustee, 290 B.R. 108, 113 (D. Minn. 2003) aff'd 379 F.3d 511 (8th Cir. 2004), cert. denied 543 U.S. 1055, 125 S. Ct. 915, 160 L. Ed. 2d 778 (2005). To determine whether the debtor's business prospects are sufficient to justify a finding of a reasonable likelihood of rehabilitation, the court must analyze if the causes for debtor's continuing losses can be corrected, and if the debtor or some other party in interest is capable or willing to perform the necessary remediation. This is not a "technical [test] of whether the debtor can confirm a plan, but rather, whether the debtor's business prospects justify continuance of the reorganization effort." In re Original IFPC S'holders, Inc., 317 B.R. 738, 742 (Bankr. N.D. Ill. 2004). Nevertheless, rehabilitation in a Chapter 11 begins with a confirmable plan. It then requires, at minimum, the prospect of re-establishment of a business. See Loop Corp., 379 F.3d at 518; Loop Corp., 290 B.R. at 113-14. "If the debtor or some

---

[8] The case law prior to the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23 (2005), is applicable to the analysis of Section 1112 of the current Bankruptcy Code, especially since the new language in Section 1112(b)(4)(A) is almost identical to the one pre-BAPCPA. See In re Gateway Solutions, Inc., 374 B.R. 556, 562 (Bankr. M.D. Pa. 2007).

21

other party in interest is unable or unwilling to put together a convincing business plan within a reasonable amount of time, and can offer neither a valid justification for the failure to do so nor a reasonable prospect of being able to accomplish the task in the near future, there is often little reason to proceed with the reorganization." Id. See also In re Winshall Settlor's Trust, 758 F.2d 1136, 1137 (6th Cir. 1985) ("The purpose of Chapter 11 reorganization is to assist financially distressed business enterprises by providing them with breathing space in which to return to a viable state ... '[I]f there is not a potentially viable business in place worthy of protection and rehabilitation, the Chapter 11 effort has lost its raison d'etre ...'") (citation omitted); A. Illum Hansen, Inc. v. Tiana Queen Motel, Inc. (In re Tiana Queen Motel, Inc.), 749 F.2d 146, 151 (2nd Cir. 1984) (dismissal warranted where no prospect of rehabilitation because the debtor lacked the "wherewithal necessary to market their properties expeditiously, [an ability] to devise a reorganization plan grounded in reality" and where secured creditors suffered as a result), cert. denied, 471 U.S. 1138, 105 S. Ct. 2681, 86 L. Ed. 2d 699 (1985); and Johnston v. Jem Dev. Co. (In re Johnston), 149 B.R. 158, 162 (B.A.P. 9th Cir. 1992). "A plan for rehabilitation under Chapter 11 must be based on more than speculative data." In re Schriock Constr. Inc., 167 B.R. 569, 576 (Bankr. D.N.D. 1994). "If it is apparent that the debtor has no profitable core around which to structure a plan of reorganization, if the debtor is faced with continuing losses, and if the debtor's assets are declining in value, the best interest of creditors may require the court to dismiss or order liquidation of the debtor's estate under Chapter 7." In re Macon Prestressed Concrete Co., 61 B.R. 432, 436 (Bankr. M.D. Ga. 1986). Also see In re Kors, Inc., 13 B.R. 676, 681 (Bankr. D. Vt. 1981). "However honest in its efforts the debtor may be, and however sincere its motives, the District Court is not bound to clog its docket with visionary or impracticable schemes for resuscitation." Tennessee Publishing Co. v. American Nat'l Bank, 299 U.S. 18, 22, 57 S.Ct. 85, 87 (1936). "[T]here must be 'a reasonable possibility of a successful reorganization within a reasonable time.'" United Sav. Ass'n v. Timbers of Inwood Forest Assoc's., 484 U.S. 365, 376, 108 S.Ct. 626, 632, 98 L.Ed.2d 740 (1988) (citations omitted). "Courts usually require the debtor do more than manifest unsubstantiated hopes for a successful reorganization." In re Canal Place Ltd. Partnership, 921 F.2d 569, 577 (5th Cir.1991); In re Brown, 951 F.2d 564, 572 (3rd Cir. 1991).

22

The record of this case and the evidence presented demonstrate that Debtor's estate has considerably diminished in value, which amply satisfies the first prong. See In re Kanterman, 88 B.R. at 29 ("[a]ll that need be found is that the estate is suffering some diminution in value"). The main diminution in this case is evident in the considerable reduction of Debtor's estate value encumbered by BPPR's lien. BPPR's total credit as to December 2010 summed $12,041,132.75 and since then the value of the estate that has been reduced to about half: $6,318,000.00. Debtor acknowledged such diminution inasmuch as the appraisals he initially presented to the court for the same properties were for $19,464,000 (alleging that BPPR was oversecured) but then later accepted BPPR's appraisals (alleging that BPPR was undersecured). See Exhibit I of Docket No. 13 (Debtor's initial appraisals), and compare to Docket No. 159 (withdrawing his motion for cash collateral in light of BPPR's appraisal). Evidently, there used to be equity in those properties, but currently there is none. Moreover, the estate has also been reduced as a result of a stipulation with Debtor for the lift of the automatic stay in regard to Banco Santander's secured property (Docket No. 221 -Minutes of Hearing on motion to lift stay with Banco Santander) and an *Order* granting Doral Bank's unopposed *Motion for Relief of Stay* (Docket Nos. 243 & 246). In addition, accumulating administrative expenses are eroding the position of the estate's creditors and further diminishing the value of the estate. See Canpartners Realty Holding Co. IV, L.L.C. v. Vallambrosa Holdings Co., 419 B.R. at 89. The trend of diminution is consistent with Debtor's pre-petition reality: Debtor's gross income has steadily declined by almost a third since 2008. In fact, the early stages of this case painted a bleak picture of rehabilitation considering that Debtor had not been able to meet his quota since about 4 or 5 prior to his filing for bankruptcy, according to his testimony during the June 9, 2011 hearing. Debtor's cash flow has also been inconsistent since the filing of the petition, as evidenced in Debtor's MORs. To that extent, the MOR for the month of November 2011, the very last one filed (Docket No. 250), demonstrates a considerable reduction in his cash flow when compared to previous MORs. See In re Consol. Pioneer Mortg. Entities, 264 F.3d 803, 806-807 (9th Cir. 2001) ("[A] negative cash flow situation alone is sufficient to establish continuing loss to or diminution of the estate.") (internal quotation marks omitted). Even if the court considers the amount accumulated in Debtor's marginal account at BPPR, any positive net income or ending

23

balance is a result of his making no payments to his secured creditors, including BPPR.

The also court takes into account that throughout the extensive litigation of this case, the very first time that Debtor offered to make any payments in principal and interests to BPPR was as recent as November 21, 2011 (Docket No. 229). In addition, Debtor's failure in obtaining alternate sources of funding and/or financing for his proposed operations for rehabilitation, particularly when he presented these efforts into evidence but never the ultimate result, militate against him. The actual historical record developed fails to support the optimistic forecast set forth in Debtor's projections. Those projections, when compared with Debtor's recent, actual and past performance, are simply not realistic.

The court concludes that record in this case together the lengthy litigation history with BPPR supports the notion that a viable reorganization is unlikely in view of Debtor's extensive liabilities and limited reduced assets. Debtor has not demonstrated a reason to believe that he had a potentially meritorious basis on which to oppose BPPR's *Motion to Dismiss*. See In re Bartle, 560 F.3d 724, 730 (7th Cir. 2009).

*(B)      Unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter [11 U.S.C. §§ 1101 et seq.].*

Pursuant to Section 1112(b)(4)(f) of the Bankruptcy Code, unexcused failure to report or to file required information constitutes cause for conversion or dismissal. Sections 704(8), 1106(a)(1), 1107(a) of the Bankruptcy Court, Federal Rule of Bankruptcy Procedure 2015 and LBR 2015-2 require debtors in possession, such as Debtor, to file monthly operating reports within the twentieth (20th) day of the subsequent month. "The non-filing of required reports must be 'unexcused', therefore indicating that the court has discretion to determine whether the debtor's failure rises to the level of cause." In re Landmark Atl. Hess Farm, LLC, 448 B.R. 707, 716 (Bankr. D. Md. 2011).

The docket of this case shows that Debtor repeatedly filed tardy monthly operating reports. See Docket Nos. 61 (MORs for December 2010 and January 2011 filed on March 18, 2011), 151 (MOR's for March, April and May 2011 filed on July 5, 2011), 207 (MOR for July 2011 filed on September 27, 2011), 225 (MOR for August 2011 filed on November 15, 2011), 243 (MOR for

24

September 2011 filed on December 2, 2011), and 244 (MOR for October 2011 filed on December 2, 2011). That is, during the whole course of 2011, of the 12 months that encompass the year, Debtor only timely filed two operating reports, to wit, the ones for January and November 2011 (Docket Nos. 95 & 250).

Generally, filing late MORs would not necessarily be in and of itself sufficient grounds for dismissal. However, after carefully considering the particular circumstances of this case, dismissal is warranted, especially in light of the fact that during the last hearing for cash collateral held on November 29, 2011 at Debtor's request, the MORs for the previous months of September and October, which were essential to consider Debtor's request, had not been filed. See Docket No. 271, p. 15, lines 20-23. And although Debtor informed the court that those MORs would be filed that same afternoon (Docket No. 271, p. 15, line 25, and p. 16, line 1), the fact is that they were not filed until December 2, 2011 (Docket Nos. 243 & 244) without any explanation for its tardiness whatsoever. The same situation happened during the hearings to consider Debtor's request for cash collateral held on March 11, 2011, June 6, 2011 and August 31, 2011. Compare with Docket Nos. 61, 151 & 207. Debtor's tardiness has hindered the proper course of this case in spite of having been forewarned since the status conference held on February 22, 2011[9]. See Docket Nos. 44 and 271. No excuse from Debtor has been offered for his repeated delays. Also see Docket No. 123 (Trustee's reasoning at ¶ 3 regarding Debtor's tardiness and lack of MORs filings).

"Refusal or inability to provide financial disclosure sounds the death knell of a Chapter 11 case. The failure to file monthly operating statements ... 'whether based on inability to do so or otherwise, undermines the Chapter 11 process and constitutes cause for dismissal or conversion of the Chapter 11 proceedings.'" In re Tornheim, 181 B.R. 161, 164 (Bankr.S.D.N.Y. 1995) (citations omitted). Similarly, in In re Crosby, 93 B.R. 798 (Bankr. S.D. Ga. 1988), the court recognized, but did not hold, that there is authority for dismissing a case for cause where a debtor did not file

_____

[9] During that hearing, Debtor denied having used cash collateral for non-agreed purposes. The court found that BPPR, the court itself and other creditors were in total dark as to his operations because at that time he had not filed any MORs since the filing of the bankruptcy petition.

25

monthly operating reports until the morning of a hearing on the failure to file the reports. Likewise, in In re Whitehurst, 198 B.R. 981 (Bankr. N.D. Ala. 1996), the court found that failing to file Chapter 11 operating reports is sufficient Section 1112(b) cause for dismissing or converting a Chapter 11 case. In Babakitis v. Robino (In re Robino), 243 B.R. 472 (Bankr. N.D. Al. 1999), the court dismissed the case *inter alia* due to debtor's failure to file his monthly operating reports and reasoned as follows: "the debtor left [the] Court and the parties without the information the reports were designed to produce. The harm is both legal and practical. Neither can be ignored." Id. at 486. The same reasoning is applicable to this case, especially at the November 29, 2011 hearing. See Docket No. 271. Since Debtor has offered no legitimate excuse for his repeated tardiness, this court deems such pattern unexcused under 11 U.S.C. § 1112(b)(4)(f). No "unusual circumstances" have been alleged regarding this cause, much less proven.

### Conclusion

In view of the foregoing, the court finds that there is sufficient cause to dismiss this case pursuant to 11 U.S.C. §§ 1112(b)(4)(a) & (f) and there being no unusual circumstances nor possibility of conversion to a Chapter 7 pursuant to 11 U.S.C. § 1112(c), the case is hereby dismissed.

Judgment shall be entered accordingly.

SO ORDERED.

In San Juan, Puerto Rico, this 23rd day of January, 2012.

Enrique S. Lamoutte
United States Bankruptcy Court

26